IN THE
UNITED STATES COURT OF APPEALS
FOR THE
ELEVENTH CIRCUIT
ATLANTA, GEORGIA

_____

APPEAL NO: 23-11558

_____

UNITED STATES OF AMERICA
Plaintiff/Appellee

Versus

MICHAEL KENDRICK
Defendant/Appellant

_____

APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

5:20-CR-00010-JA-PRL

_____

INITIAL BRIEF

_____

Olivia M. Goodman
O'Brien Hatfield, P.A.
Bayshore Center
511 West Bay Street, Suite 330
Tampa, Florida 33606
(813) 228-6989
Florida Bar No. 1025589
COUNSEL FOR APPELLANT

*United States of America v. Michael Kendrick*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26-1, I hereby certify that the persons listed below are interested in the outcome of this case:

1. Antoon, Hon. John, II, United States District Judge;

2. Bird, Christine N., Federal Public Defender's Office;

3. Boyer, Tyrie K., Assistant United States Attorney;

4. Corrigan, Hon. Timothy J., United States District Judge;

5. Dalton, Hon. Roy B., United States District Judge;

6. Felicetta, Michael, Assistant United States Attorney;

7. Hall, A. Fitzgerald, Federal Public Defender;

8. Handberg, Roger B., United States Attorney;

9. Hoppmann, Karin, former Acting United States Attorney;

10. Kendrick, Michael, Defendant-Appellant;

11. Lammens, Hon. Philip R., United States Magistrate Judge;

12. Lopez, Maria Chapa, United States Attorney;

13. Rhodes, David P., Assistant United States Attorney, Chief, Appellate Division;

14. Seider, Germaine M., Assistant United States Attorney; and

15. Stamm, Douglas J., former Assistant Federal Public Defender.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant, MICHAEL KENDRICK, does not request oral argument. It is respectfully submitted that the arguments and facts are clear on the face of the record on appeal; this Honorable Court will not need assistance in resolving this action.

## CERTIFICATE OF STYLE AND FONT

This brief is written in 14 point Times New Roman. To the best of Counsel's information and belief, it is 10 pitch.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS…………......……….…..……..….…I

STATEMENT REGARDING ORAL ARGUMENT……………......…..……….III

CERTIFICATE OF STYLE AND FONT…………......……………..……..….III

TABLE OF CONTENTS…………......…………………………….……...IV

TABLE OF AUTHORITIES…………......………………………..……..VI

STATEMENT OF JURISDICTION…………......………………….…….……...1

STATEMENT OF THE ISSUES…………….......……………………….……1

STATEMENT OF THE CASE…………….......……………………….……..2

    **(i)    Course of Proceedings and Disposition in the Court Below**…...….2

    **(ii)    Statement of Suppression Hearing Facts**……………………......3

    **(iii)    Statement of Trial Facts**……………………………….……..9

    **(iv)    Statement of Sentencing Facts**……………………………22

    **(v)    Standard of Review**…………………………………………24

SUMMARY OF THE ARGUMENT…………………………………….……25

ARGUMENT AND CITATIONS OF AUTHORITY……………………………27

**I.    THE DISTRICT COURT ERRED IN DENYING THE APPELLANT'S MOTION TO SUPPRESS**………………….………………………….……27

**II.    THE DISTRICT COURT ERRED IN DENYING THE APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL WHEN THE EVIDENCE PRESENTED WAS INSUFFICIENT TO SUSTAIN A CONVICTION**………………….38

**III.    THE DISTRCT COURT ABUSED ITS DISCRETION IN PROVIDING SUPPLEMENTAL JURY INSTRUCTIONS OVER OBJECTION OF DEFENSE COUNSEL**……………...…………..46

**IV.    THE DISTRICT COURT ERRONEOUSLY OVERULED THE APPELLANT'S OBJECTION TO THE NUMBERICAL VALUE OF THE BASE OFFENSE LEVEL AND ABUSED ITS DISCRETION BY IMPOSING AN UPWARD VARIANCE AND BY IMPOSING A SUBSTANTIALLY UNREASONABLE SENTENCE**………………48

CONCLUSION…………………………………………………………...…51

CERTIFICATE OF COMPLIANCE………………………..……………....52

CERTIFICATE OF SERVICE…………………………………..………………..53

# TABLE OF AUTHORITIES

**CASES**

*United States v. Bautista-Silva*, 567 F.3d 1266, 1271 (11th Cir. 2009). ................24

*Hart v. Att'y Gen. State of Fla.*, 323 F.3d 84, 895 (11th Cir. 2003)....24, 36, 37, 38

*United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007) ...........................24

*United States v. Facey*, 386 Fed. Appx. 910, 913 (11th Cir. 2010) .......................24

*United States v. Herrera*, 931 F.2d 761, 762 (11th Cir. 1991) ..............................25

*United States v. Lopez*, 590 F.3d 1238, 1253 (11th Cir. 2009) .................25, 46, 48

*United States v. Tome,* 611 F.3d 1371, 1378 (11th Cir. 2010). ..............................25

*Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) ............................................27

*Delaware v. Prouse*, 440 U.S. 648, 662 (1979) ...............................................27, 31

*Terry v. Ohio*, 392 U.S. 1, 88 (1968) .....................................................................27

*United States v. Harris*, 526 F.3d 1334, 1335 (11th Cir. 2008). ...........................27

*United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999). ...........................27

*United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004).................28, 30, 31

*Wong v. United States*, 371 U.S. 471 (1963)..........................................................28

*Whren v. United States*, 517 U.S. 806, 809 (1996) ................................................28

*United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) ...............29

*United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000) ..............................30

*California v. Hodari D.*, 499 U.S. 621, 629 (1991) ...............................................31

*United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)............................31

*United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006)............................32

*United States v. Delancy*, 502 F.3d 1297, 1309 (11th Cir. 2007) ....................32, 33

*United States. v. Timmann*, 741 F.3d 1170, 1182 (11th Cir. 2013) .......................33

*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ....................................................34

*Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). .....................................................34

*Moran v. Burbine*, 475 U.S. 412, 420 (1986)...........................................................35

*Berghuis v. Thompkins*, 560 U.S. 370 (2010) ..........................................................35

*United States v. Freyre–Lazaro,* 3 F.3d 1496, 1504 (11th Cir. 1993) ....................39

*United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir. 1983)................................39

*United States v. Farris*, 77 F.3d 391, 395 (11th Cir. 1996) ....................................39

*United States v. Edwards*, 166 F.3d 1362, 1363 (11th Cir. 1999) ..........................39

*United States v. Knight*, 705 F.2d 432, 433 (11th Cir. 1983)..................................39

*United States v. Pérez-Greaux*, 83 F.4th 1, 23 (1st Cir. 2023) .........................39, 40

*United States v. Timmons*, 283 F.3d 1246, 1253 (11th Cir. 2002).........................40

*United States v. Ceballos-Torres*, 218 F.3d 409, 414-15 (5th Cir. 2000) ..............40

*United States v. Beckles*, 565 F.3d 832, 841 (11th Cir. 2009) ...............................40

*United States v. Peart*, 888 F.2d 101, 104 (11th Cir. 1989)...................................40

*United States v. Bailey*, 553 F.3d 940, 947 (6th. Cir. 2009). ...........................42, 43

*Cunningham v. Distr. Atty's Off. for Escambia Cnty.*, 592 F.3d 1237 (11th Cir. 2010) ...................................................................................................44

*United States v. Garcia*, 489 Fed. Appx 334 (11th Cir. 2012)...............................45

*United States v. Descent*, 292 F.3d 703, 707 (11th Cir. 2002)...............................46

*United States v. Black*, 845 Fed. Appx. 42, 49-50 (2d Cir. 2021),...................47, 48

*Brown v. United States*, 144 S. Ct. 1195 (2024) .....................................................49

*United States v. Jackson*, 55 F.4th 846 (11th Cir. 2022)........................................49

*United States v. Pugh*, 515 F.3d 1179, 1189-90 (11th Cir. 2008)....................49, 50

*United States v. Martin*, 455 F.3d 1227, 1237 (11th Cir. 2006) ...........................50

*Spears v. United States*, 555 U.S. 261, 266 (2009) ................................................50

S<small>TATUTES</small>

21 U.S.C. § 841(b)(1)(A) ...........................................................................................2

21 U.S.C. § 841(b)(1)(c) ............................................................................................2

18 U.S.C. § 924(c)(1)(A)(i) ........................................................................................2

18 U.S.C. § 922(g)(1) .................................................................................................2

18 U.S.C. § 924(e).......................................................................................................2

18 U.S.C. § 924(c).................................................................................................22, 49

18 U.S.C. § 3553 .......................................................................................................50

## RULES

F.R.C.P. 29(a)......................................................................................26, 39

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. IV..............................................................................27

U.S. Const. amend. V. .............................................................................34

## STATEMENT OF JURISDICTION

Title 28 U.S.C. § 1291 provides that the court of appeals shall have jurisdiction of appeals from all final decisions of the district court of the United States except where a direct review may be had in the Supreme Court.

The United States District Court, Middle District of Florida, Ocala Division, had jurisdiction pursuant to Title 18 U.S.C. § 3231. This is an appeal from the sentencing and Final Judgment entered by the District Court on April 20, 2023. (Doc. 178). The Appellant filed his Notice of Appeal on May 3, 2023. (Doc. 180).

## STATEMENT OF THE ISSUES

Whether the district court erred in denying the Appellant's motion to suppress the fruits of an illegal seizure.

Whether the district court erred in denying the Appellant's motion for judgment of acquittal when the evidence was insufficient to prove the charged crimes.

Whether the district court abused its discretion in providing supplemental jury instructions over objection of defense counsel.

Whether the district court erroneously overruled the Appellant's objection to the numerical value of the base offense level and abused its discretion by imposing an upward variance and by imposing a substantially unreasonable sentence.

## STATEMENT OF THE CASE

### i. Course of Proceedings and Disposition in the Court Below

On December 20, 2020, a federal grand jury issued a superseding three-count indictment against the Appellant, Michael Kendrick. (Doc. 80). The indictment charged the Appellant in Count I with knowingly and intentionally possessing with intent to distribute Eutylone (a Schedule I controlled substance) in violation of Title 21, United States Code, Sections 841(b)(1)(A), and 841(b)(1)(C). (Doc. 80 at 1). As to Count II, the Appellant was charged with knowingly possessing a firearm in furtherance of a violation of Title 21, United States Code, Sections 841(b)(1)(A), and 841(b)(1)(C), as alleged in Count I of the indictment, in violation of Title 18, United States Code Section 924(c)(1)(A)(i). (Doc. 80 at 2). Finally, in Count III, the Appellant was charged with knowingly possessing a firearm, in and affecting interstate commerce, while knowing that he had been previously convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e). (Doc. 80 at 2-3).

On July 29, 2020, the Appellant filed a Motion to Suppress. (Doc. 35). Following a suppression hearing before the Honorable Philip R. Lammens at the magistrate court, on November 2, 2020, the Honorable John Antoon II accepted the Honorable Lammens' recommendation to deny the motion. (Doc. 70).

This matter went to trial on March 9, 2021. The jury was adjourned on March 11, 2021, to deliberate. That day, the jury returned a verdict finding the Appellant guilty as charged to all counts. (Doc. 209 at 208).

The Appellant's sentencing hearing commenced on October 21, 2021, and after a bifurcation, concluded on April 20, 2023. Ultimately, the Appellant was sentenced to a global incarcerative sentence of 144 months in the United States Bureau of Prisons (BOP): a term of 84 months as to Counts I and III, to run concurrent; and 60 months as to Count II, to run consecutively to the sentence imposed in Counts I and III. (Doc. 212 at 45; Doc 178). The Appellant timely filed his Notice of Appeal on May 3, 2023. (Doc. 180). The Appellant remains incarcerated today.

### ii. Statement of Suppression Hearing Facts

On September 18, 2020, a hearing on the Motion to Suppress was conducted. (Doc. 64). The Motion to Suppress sought to prohibit the introduction of any evidence seized or subsequent statements made after law enforcement illegally detained the Appellant and the introduction of any statements he made after his subsequent arrest on federal charges. (Doc. 35 at 3-4).

Officer Shelby O'Grady, the first witness for the Government, testified that on the date of the incident, July 6, 2019, she had been a patrol officer with the Ocala Police Department for approximately one year. (Doc. 64 at 9). The zone that she had

been assigned to patrol was a high-crime area with which she was personally familiar. (Doc. 64 at 12, 14). Around 1:30 AM, she was traveling eastbound, in a marked police vehicle, on West Silver Springs Boulevard, a well-lit, two-laned road, driving approximately 45 miles per hour. (Doc. 64 at 11, 14-16). The only other vehicle on the road, which was traveling westbound but then turned onto 11th Avenue, and began facing towards her, caught her attention (Doc. 64 at 15-19). She then stopped in a turn lane and alleged that could see the vehicle through the side-view mirror on the driver's side. (Doc. 64 at 20). The Appellant "pass[ed] the posted stop sign crossing over the—the bold stop bar and stopping within the crosswalk of that intersection." (Doc. 64 at 21).

She testified that the vehicle used the turn signal, but it did not come to a complete stop until it was in the crosswalk. (Doc. 64 at 22). She believed that this was a lawful basis to stop the Appellant, so she turned around to follow him, but she did not activate her emergency lights. (Doc. 64 at 22-23). His vehicle continued to move westbound, but then he turned onto Southwest 16th Court and pulled into a residence. (Doc. 64 at 24). She did not immediately turn onto the street because she saw the vehicle lights turn off and no one exited the vehicle, so she believed that he was "actually maybe going home." (Doc. 64 at 25-26). Nonetheless, she turned down the next street to circle back around and see if he actually made it home—she was "just following suspicion as if he is doing something illegal or not." (Doc. 64 at 26-

27). When she pulled back around, she observed the vehicle already back on the roadway. (Doc. 64 at 28). She still did not activate her lights. (Doc. 64 at 28). He then turned onto 20th Avenue and at that point she dispatched over the radio the tag, the location, and the vehicle description. (Doc. 64 at 29-30). She activated her lights, which triggered her dash cam, and then the Appellant turned into a residential address at 2022 SW 14th Street. (Doc. 64 at 30-32). She saw the Appellant exit the vehicle, so she opened her door and ordered him back inside the vehicle, but he ran, so she pursued him. (Doc. 64 at 31-33). She used a TASER on him, handcuffed him, took him into custody, and then other officers arrived. (Doc. 64 at 33).

She testified that when she saw the Appellant flee from her, she did not see him drop anything. (Doc. 64 at 33). The dashcam and bodycam footage were received into evidence. (Doc. 64 at 36). She testified that she asked him why he tried hiding from her, referring to when he pulled into the residence at 16th Court, and then she asked him why he ran from her. (Doc. 64 at 40-41). She tased him because he was actively resisting, but after he was handcuffed, he was compliant. (Doc. 64 at 40).

After her commanding officer arrived at the scene, she collected items that were found on or around the Appellant's person, including three cell phones and more than $1,800 in cash, and when she returned back her vehicle, another officer advised her that there was a bag of suspected drug contraband that was located right

outside the Appellant's driver's door. (Doc. 64 at 44-46). After she collected the bag, she asked the K-9 officer and his dog sweep the vehicle and the area that the Appellant fled. (Doc. 64 at 44-45). The dog alerted on the vehicle for narcotics. (Doc. 64 at 46). Before the vehicle was towed, O'Grady and Officer Gago conducted an inventory search of the vehicle. (Doc. 64 at 46-47). She found a scale and some plastic baggies within the driver's side door.  (Doc. 64 at 47). Gago found a gun, a .40 caliber Smith & Wesson with a loaded clip of ammunition, under the front passenger seat. (Doc. 64 at 48). All evidence was placed on the trunk of the Appellant's vehicle. (Doc. 64 at 48). She conducted a field test of the narcotics. (Doc. 64 at 48-49).  No one interviewed people living at either residence he pulled into it. (Doc. 64 at 50).  Finally, she testified that other than the traffic offense which she had allegedly witnessed, there was no other reason for her to stop this vehicle. (Doc. 64 at 53).

On cross-examination, O'Grady testified that on the night of the incident, she had been working on the road alone for only five months. (Doc. 64 at 64). Since she was in a high-crime area, she was looking for infractions to further investigate individuals. (Doc. 64 at 56). She knew the area well; she could not specifically see the stop bar, but she could allegedly see the crosswalk. (Doc. 64 at 59-60). She could not recall whether she wrote the Appellant a citation for failure to stop; and after he pulled off into the first driveway, she decided not to ticket him.  (Doc. 64 at 63-64).

When she was detaining him, touching his person, and picking up his personal items, she was not wearing gloves. (Doc. 64 at 69-70).

Task Force Officer Brendan Ferguson testified that he and an agent, Shawn Newsom of ATF, attempted to execute an arrest warrant for the Appellant on February 12, 2020, at the county courthouse, knowing that the Appellant was there for a scheduled appearance for this matter in state court. (Doc. 64 at 81). They were with a bailiff, and they informed the Appellant, who was cooperative, that they had a federal warrant. (Doc. 64 at 81-82). They walked outside, Newsom went to get his vehicle, and while Ferguson was with the Appellant, he advised him of his rights by reading them off a form, and the Appellant signed the form. (Doc. 64 at 83). He recorded the interaction on his cellphone, starting as soon as they exited the front doors. (Doc. 64 at 83-84). The recording was admitted into evidence and a transcript was admitted as a demonstrative exhibit. (Doc. 64 at 87-88).

At one point, the Appellant said, "I know you read me my rights and stuff, but I really don't know. You know what I'm saying?" (Doc. 64 at 92). On the recording, Ferguson said that the Appellant was read his rights on a previous recording, but he testified that he might have misspoken then because there was just one recording. (Doc. 64 at 92). Ferguson was aware that when a defendant makes an inquiry about *Miranda*, they must do their best to clarify it. (Doc. 64 at 99). The Appellant never said that he did not want to answer questions, never invoked silence, and never asked

for an attorney. (Doc. 64 at 93).

On cross-examination, Ferguson testified that once he read him his *Miranda* warnings, he never specifically asked him if he wanted to talk to him, but immediately confronted him with alleged DNA evidence that they had against him. (Doc. 64 at 96-98). He did not tell the Appellant that he was recording him. (Doc. 64 at 97). Ferguson testified that in response to the confrontation, the Appellant said "something that could be incriminating about touching the gun." (Doc. 64 at 98). After his testimony, the Government rested. (Doc. 64 at 100).

The Appellant's first witness, Leslie Calajo, an investigator at the Federal Defender's Office, testified that she investigated the scene where Officer O'Grady allegedly saw the Appellant's car. The car was approximately 575 feet away when O'Grady claimed he failed to stop before the stop bar. Calajo testified that if someone stopped their vehicle before the pertinent stop bar, rather than after it, they would not be able to see oncoming traffic without pulling forward. (Doc. 64 at 105, 110). She also testified that a driver in the position of O'Grady's cars would be able to see only the stoplights while looking in the sideview mirror—they would not be able to see the stop bar or the crosswalk because there would be trees and road signs blocking the view, especially if it were dark outside. (Doc. 64 at 107-09, 117).

On cross-examination, the Government questioned her regarding whether the model of her vehicle was different than O'Grady's, specifically with respect to

differences in their respective sideview mirrors, but she testified that even when she was just standing and looking back, she could not see the stop bar. (Doc. 64 at 121-23).

At the close of the hearing, the district court did not make an oral ruling. (Doc. 64 at 153). On November 11, 2020, the district court issued an order denying Appellant's Motion to Suppress, incorporating by reference magistrate Judge Lammens' report that the motion should be denied. (Doc. 70 at 1-2; Doc. 59).

### iii. Statement of Trial Facts

The first witness for the Government, Officer O'Grady testified as she had at the motion to suppress hearing. With respect to new or contradictory testimony, she testified that the vehicle was registered to the Appellant's mother, Sorena. (Doc. 207 at 223). After O'Grady saw the Appellant's vehicle pull out of the first residence he backed in to, it "raised her heightened sense of suspicion." (Doc. 207 at 172). She did not see anyone else get out of the vehicle, but she did lose sight of the vehicle when she circled the block. (Doc. 207 at 175). After she arrested the Appellant, she learned that he lived one block east and nine blocks over from the first address, but when he pulled out of it, he headed westbound, which was further away from his residence. (Doc. 207 at 188-89). The Government published her dashcam footage and asked her if she reviewed it to determine whether she could see an item falling

to the ground as the Appellant got out of his car and whether she observed it, to which she responded yes. (Doc. 207 at 199).

O'Grady testified that after she tased him, she asked him, "Why did you try hiding from me?" and "Why did you try running from me?" with respect to him "hiding" by pulling into the first driveway and him running on foot. (Doc. 207 at 210). He responded by saying, "There was other people in the car too, they just got away." (Doc. 207 at 244). Then she asked him, "Who else was in the car with you that you said ran?" and he responded, "I was just dropping people off, ma'am." (Doc. 207 at 212). She testified that after that, she struggled to put on gloves before collecting his personal items because she was sweating. (Doc. 207 at 213). She collected on or about the Appellant's person a set of keys that were on his neck, two cell phones, a debit card with his name issued on it, and approximately $1,884. (Doc. 207 at 215). She then conducted an inventory search of the vehicle, and in the driver's side door, she found 29 empty baggies inside a Ziploc bag as well as a digital scale. (Doc. 207 at 217-18, 231). She also found prescription pills that belonged to the Appellant's mother. (Doc. 207 at 223). Finally, Officer Gago found the firearm under the front passenger's seat, behind the bar that allowed the seat to move forward and backwards. (Doc. 207 at 218, 225). A presumptive field test was done on the suspected drugs found on the ground, which came back positive for narcotics. (Doc. 207 at 222).).

On cross-examination, O'Grady testified that the first driveway he pulled into was past an AutoZone. (Doc. 208 at 24). During the chase, the Appellant was sweating. (Doc. 208 at 33). While her gloves were on, she collected the property that had been on his person and in his pockets, picked up the contraband, opened the driver's side door, patted the driver's seat, and handled the gun. (Doc. 208 at 35-40). Once he was taken into custody, she ticketed him only for felony driving with license suspended or revoked. Doc. 208 at 30).

On redirect, she testified that she did not clear the weapon nor touch the trigger. (Doc. 208 at 41-42). The residence where the stop was conducted had a fenced yard and she did not hear rattling or see anyone running. (Doc. 208 at 43).

The third witness, Andrew Rocafort, a crime scene technician with the Ocala Police Department, testified that in this case, he processed eight rounds of .40 caliber ammunition, a digital scale, 29 plastic bags, and a Smith & Wesson firearm. (Doc. 208 at 49, 53). He did a test-fire on the gun and determined that it was operable and functioned properly. (Doc. 208 at 62). He also processed the firearm for DNA, swabbing three separate areas, each with a pair of swabs, including: the trigger and guard; the magazine; and the grip, slide, and sights. (Doc. 208 at 53-54). He processed the other items, including the firearm, for fingerprints. (Doc. 208 at 57-58). He was able to develop a possible fingerprint from the scale. (Doc. 208 at 59-60).

On cross-examination, he testified that when he was collecting the samples, he did not touch any of the items with his bare hands and wore clean gloves to avoid any potential cross-contamination. (Doc. 208 at 65). He did not perform the fingerprint comparison, but he did learn that there was no match with anyone. (Doc. 208 at 68).

The fourth witness, Special Agent Sean Newsom, testified that he was working with a federal task force officer, Officer Ferguson, who had brought the Appellant's case to the attention of ATF. (Doc. 208 at 76, 78). Newsom determined that the DNA on the gun should be tested in a private lab and that the only known samples of comparison submitted were buccal swabs from the Appellant and his mother. (Doc. 208 at 80-83).

He testified that he had been involved in several hundred undercover sales cases and that although he had never dealt with eutylone before, he had dealt with similar substances. He had regularly seen baggies like the ones found in the vehicle and thought that a person having 29 of them was a heavy indicator that they were distributing narcotics. (Doc. 208 at 85-86). When he was undercover, he had his own set of digital scales, cash with different denominations, and several cell phones, but in this case, he did not decide to download the cellphones found on or about the Appellant's person because he already believed he was looking at a narcotics dealer. (Doc. 208 at 86-88).

Newsom testified that on September 23, 2019, when he presented the warrant to collect the Appellant's buccal swabs, the Appellant "did not want to open is mouth." (Doc. 208 at 90). After he collected the swab, the Appellant began asking him questions, so then he read him his rights. The Appellant said "Sure," so then the special agent said he was going to do it again, meaning he was going to turn the recorder on and read him his rights again and have him sign the waiver. (Doc. 208 at 102-03). Newsom testified that he told the Appellant that if a defendant in the federal system admitted to their own conduct and disclosed the conduct of others, they could get a benefit. (Doc. 208 at 104). However, the Appellant never admitted to the firearm, nor the drugs, nor told Newsom about other people. (Doc. 208 at 105).

He testified that the Appellant first told him that he did not know "none of this stuff" was in his car and that he was coming from the club and had dropped some guys off. (Doc. 208 at 105-06). He also told him that he was the driver and should not get charged for the gun because there were other people that he had just dropped off. (Doc. 208 at 107-08).

On cross-examination, Newsom testified that in his report regarding his interrogation of the Appellant outside the county courthouse, he did not indicate that he had asked the Appellant questions or that he orally waived his rights. (Doc. 208 at 113). He testified that in the recording, he told him the Appellant there were only two ways to help himself: accepting the facts, admitting he was wrong, and helping

the special agent catch other bad people; and towards the end, the special agent reiterated that there were two ways to help, and told the Appellant to think about what he had said. (Doc. 208 at 113-15). At that point, the Appellant did not give him any names for other occupants of the vehicle, but he did provide them later. (Doc. 208 at 115).

On redirect, Newsom testified that the Appellant gave names to a task force officer after the special agent arrested him. (Doc. 208 at 115-16). The names were Kirby and Lamar—Kirby, whose legal name was Cornelius Brown, was then deceased. (Doc. 208 at 117).

The fifth witness, Samantha Wandzek, a forensic DNA analyst, testified that when someone is sweating, they shed more skin cells. (Doc. 208 at 136). DNA could get transferred from one thing to another when you touch it or when you drip sweat. (Doc. 208 at 142). For the grip and the slide, there were at least three individuals in that sample; the Appellant's DNA profile was fully represented, and his mother was not fully represented, but she could not be ruled out. (Doc. 208 at 157, 160). The trigger and the guard were "NR," meaning that the samples showed signs of being degraded, but the Appellant and his mother could not be ruled out as contributors. (Doc. 208 at 160-62). The results were input into software which hypothesized that the DNA profile obtained from the grip and slide swabs was approximately 350 quadrillion times more probable that the sample originated from the Appellant and

three unknown persons than if it originated from four unknown persons; the DNA profile from the trigger and the guard swabs was approximately 100 trillion times more probable that the sample originated from the Appellant and two unknown persons than if it originated from three unknown persons. (Doc. 208 at 162, 64-65). One individual, out of four, contributed 89% to the grip and slide sample, and Appellant was assigned as the best fit to that contributor. (Doc. 208 at 170-71). One individual, out of three, contributed 83% to the trigger and guard sample, and Appellant was assigned as the best fit to that contributor. (Doc. 208 at 172).

The sixth witness, Special Agent Justin Mace, an agent with ATF, opined as an expert witness that the gun was made in Massachusetts. (Doc. 208 at 185).

The seventh witness, Scott Harder, a crime laboratory analyst at the FDLE, testified that he received a package of tan crystalline substance for analysis. (Doc. 208 at 192-93). He determined the substance was eutylone, weighing 22.69 plus or minus 0.144 grams. (Doc. 208 at 195).

On cross examination, he testified that he analyzed only one item in this case, a substance in a single bag, and that he did not analyze the 29 individual bags nor the digital scale. (Doc. 208 at 201-02). Multiple isomers of eutylone existed and he could not opine as to whether the moving of one carbon group in an isomer would change the physical property of a substance. (Doc. 208 at 202).

The Government's final witness, Officer Ferguson testified as he did at the Motion to Suppress hearing. With respect to new or contradictory testimony, he testified that once they get in the car, he said to the Appellant, "Got the DNA results back. His DNA is all over that gun," and the Appellant responded, 'Well, he never asked me if I touched it." (Doc. 208 at 237). He testified that Appellant also stated that there were other people in the car who fled from the vehicle, but Ferguson told him the dash cam video showed no one left the car but him. (Doc. 208 at 237). The Appellant stated, "We had just left the club. When he left the club, he was driving the car, my homeboy that passed, he was driving the car. I dropped them off first, then I got in the driver's seat." (Doc. 208 at 238). He also told them the name of his cousin, Lamar, and of the friend who had passed, Kirby. (Doc. 208 at 238-39).

On cross-examination, Ferguson testified that even though he read the Appellant his rights, he never actually asked him if he wanted to speak with him. (Doc. 208 at 242).

After the Government rested, the Appellant moved for a judgment of acquittal as to all counts. With respect to Count I, defense counsel argued that there was insufficient evidence that the Appellant intended to distribute the eutylone because there were no prints or DNA on the paraphernalia—they were just simply in close proximity to him—and even though the Government argued that the baggie was in his lap, the video was equally susceptible to interpretation that the baggie was on the

floor or near the door—so the proximity to the substance itself was insufficient. (Doc. 208 at 246-47). Further, there was no evidence of distribution because there was no evidence of a potential buyer/any communications with anyone else. (Doc. 208 at 247).

With respect to Count II, defense counsel argued that the Government could not meet its burden that he knowingly possessed a firearm in or affecting interstate commerce because it was found in the passenger's side of the vehicle, and even though he indicated at some time in the past he had touched the firearm that belonged to Kirby, there was no indication that he knew it was there that night, and touching was insufficient to prove possession. (Doc. 208 at 247-48). Further, the evidence linking him to the gun lacked credibility given the contamination of the DNA samples and he never admitted that he owned the gun or had seen it that night. (Doc. 208 at 248). And with respect to whether he knowingly possessed a firearm in the furtherance of the drug trafficking crime charged, there was no evidence that the firearm under the seat furthered the crime of drug trafficking. (Doc. 208 at 248-49).

The Government responded that it opposed the motion and believed a prima facie had been made, but it would rely upon the trial record. (Doc. 208 at 249). The court denied the motion as to Counts I and III, but reserved ruling on Count II. (Doc. 208 at 249).

The Appellant's first witness, Lamar Stanley, Appellant's cousin, testified that his grandmother lived on 4th Street and 10th Avenue in Ocala, where people would park their cars in the lot across the street and hang out. (Doc. 208 at 252-55, 257). The vehicle the Appellant was driving on the night of the illegal detention belonged to Appellant's mother. (Doc. 208 at 255). That night, the Appellant, Kirby, and Stanley went to a party by his grandmother's house and then the club, where Stanley got very intoxicated. (Doc. 208 at 257-59). The firearm belonged to Kirby. (Doc. 208 at 260). He knew it belonged to him because he always brought that gun with him, and he had seen him with that gun numerous times. (Doc. 208 at 260).

After the club, they went back to his grandmother's, dropped Kirby off right behind the AutoZone, and then Stanley got into the passenger's seat. (Doc. 208 at 262). After the stop, he saw the Appellant run from the car, and approached girl from the house because he knew the people that lived there. (Doc. 208 at 262-61).

On cross-examination, he testified that when the Appellant dropped Kirby off, they were panicking about the police, so Kirby got out, Stanley moved, and they pulled off again. (Doc. 209 at 10). Stanley was initially reluctant to speak poorly of Kirby, who was since deceased, but Stanley later testified that although he did not see any alleged contraband that night, he knew that Kirby was a drug dealer from "time to time," and would sell whatever he could. (Doc. 209 at 16-17, 19).

Stanley testified that he owned two phones, one of which he lost that night. (Doc. 209 at 21). He had between $500.00 to $1,000.00 on him for the club and because they were considering going to the casino that night. (Doc. 209 at 21-23).

The second witness, Nancy Peterson, a forensic DNA consultant, testified that she would not contradict the lab report regarding the presence of Appellant's DNA, but that some people shed more DNA than others, especially while sweating. (Doc. 209 at 41-43). She testified that there was an experiment in a crime laboratory where they checked the gloves of a person and they found that gloves picked up and transferred a lot more DNA than was expected. An additional study examined secondary transfer, wherein people who touched the same object but not each other would have their respective DNA transferred between them without direct contact. (Doc. 209 at 46-47). She opined that the DNA on the gun could have been transferred, regardless of the fact that there was a large quantity of it present, because O'Grady failed to use protocol that would preserve the evidence by touching the Appellant and his belongings and putting on gloves before washing her hands. (Doc. 209 at 47-49).

The third witness, Latrista Styles, the Appellant's girlfriend, testified that the Appellant received a settlement around May 23, 2019, including a check in the approximate amount of $1,773.50. (Doc. 209 at 96-967). The Appellant owned a

pressure washing and detailing business, so he owned business and personal phones. (Doc. 209 at 97).

On cross-examination, Styles testified that he did not have a bank account prior to receiving the checks. (Doc. 209 at 99).

The fourth witness, Derrick St. Fort, an investigator at the Federal Public Defender's Office, testified that he drove around and videotaped the block where O'Grady allegedly saw the Appellant fail to come to a complete stop and that the distance between where her and the Appellant's cars were was 574 feet. (Doc. 209 at 105-06). When he drove around the block of the first residence that the Appellant pulled into, he was unable to see the front of the houses. (Doc. 209 at 107).

Later, the Appellant renewed his motion for judgment of acquittal as to all counts. (Doc. 209 at 129). The court denied the motion. (Doc. 209 at 129).

During closing, with respect to Count II, defense counsel argued the following:

> [T]o prove possession of a firearm in furtherance of a drug trafficking crime is that the firearm was possessed in the furtherance of a drug trafficking crime. That means that it helped promote it or advance the crime in some way. There's no evidence of that. . . Even if you believe that Mr. Kendrick was distributing drugs, there's no evidence that the gun ever came into play. It just simply didn't happen.

(Doc. 209 at 174).

Then, during jury instructions, the court instructed the following regarding Count II: possessing of a firearm in furtherance of a crime means that the firearm helped, promoted, or advanced the crime in some way. (Doc. 209 at 191).

After the jury began deliberations, a juror asked the court to define "furtherance." (Doc. 209 at 201). The court stated that the two options would be to tell the jury that they must rely on the instructions they were given or to provide them supplemental instructions. (Doc. 209 at 201-02). Defense counsel objected and argued that in her closing, she spoke directly about the instruction and the definition that was given, and then tailored her arguments around that instruction, so changing the instruction would prejudice the Appellant. (Doc. 209 at 202-03). The court rejected her argument and gave the following instruction:

> Factors relevant to determining whether the Government established "in furtherance of" element, include but are not limited to: (1) the type of drug activity that is being conducted; (2) accessibility of the firearm; (3) the type of weapon; (4) whether the weapon is stolen; (5) the status of the possession, legitimate or illegal; (6) whether the gun is loaded; (7) proximity to drugs or drug profits; and (8) the time and circumstance under which the gun is found.

(Doc. 209 at 205).

The jury returned a verdict of guilty as charged for Counts I, II, and III. (Doc. 209 at 207-08). The court adjudicated the Appellant guilty as charged for all counts. (Doc. 209 at 210).

### iv. Statement of Sentencing Facts

The Appellant's sentencing hearing commenced on October 21, 2021, and after a bifurcation, concluded on April 20, 2023. (Doc. 198 at 1; Doc. 212 at 1). At both hearings, the Appellant took responsibility and presented overwhelming evidence of mitigating factors with respect to the abject hardships he has faced since the day he was born and the repeated failure of the system to rehabilitate him. (Doc. 198 at 20-30; Doc. 212 at 14-28).

The PSI indicated that the Appellant's total offense level offense score was 34 with the enhancement under the Armed Career Criminal Act (ACCA). Appellant raised that, when the Appellant was sentenced in 2015 for three cocaine convictions, the Florida Statute was overbroad because it listed cocaine and derivatives, whereas the schedules in the Controlled Substances Act, as of the date of the hearing, had been amended to exclude a derivative, Ioflupane. Thus, those prior convictions would not qualify as an ACCA predicate, and Appellant's base level offense would be reduced. (Doc. 198 at 12-19, 43-45).

Ultimately, the Appellant requested the court to sentence him to 80 months followed by the 60-month sentence, as per Title 18 U.S.C. § 924(c), but requested that the mandatory 60 months were served up front to allow for time-served credits. (Doc. 198 at 29). The Government countered that it was seeking an ACCA enhancement and requested a sentence of 262 months, which was at the low end of

the guidelines, and that the 60-month sentence had to be consecutive. (Doc. 198 at 41). Ultimately, the district court bifurcated the sentencing hearing for additional briefing.

At the 2023 hearing, the Government had abandoned the ACCA enhancement. Even so, with respect to the prior objection, defense counsel noted that based on the overbreadth of the Florida Statute on the date of his 2015 cocaine convictions, Appellant's total offense level should be 14. (Doc. 212 at 8-11, 38). United States Probation also calculated Appellant's total offense level as 14. (Doc. 174 at 25). The Government argued that the operative date should be the date of the crime rather than the conviction, so the total offense level should be 20. (Doc. 212 at 10). The court rule against the Appellant and ruled that the total offense level was 20 with a criminal history category IV, for a guidelines range of 70 to 87 months. (Doc. 212 at 12-13).

Then, the Government requested 84 months to be followed by a consecutive 60 months for Count II, for a global sentence of 144 months. (Doc. 212 at 32).

The Appellant was sentenced to a global incarcerative sentence of 144 months in BOP: a term of 84 months as to Counts I and III, to run concurrent; and 60 months as to Count II, to run consecutively to the sentence imposed in Counts I and III. (Doc. 212 at 39, 45). The district court stated that the sentence imposed would have been

the same, regardless of the issue regarding the base offense level of 14 versus 20, and

**Standard of Review**

I.    This Court reviews the denial of a motion to suppress under a mixed standard of review, reviewing the district court's factual findings for clear error, and its application of law to those facts de novo. *United States v. Bautista-Silva*, 567 F.3d 1266, 1271 (11th Cir. 2009). All facts are construed in the light most favorable to the prevailing party below. *See id*. "The admission of statements obtained in violation of *Miranda* is subject to harmless error scrutiny. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Hart v. Att'y Gen. State of Fla.*, 323 F.3d 884, 895 (11th Cir. 2003).

II.    This Court reviews *de novo* a district court's denial of a motion for judgment of acquittal on grounds of insufficient evidence. *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007). "In determining whether sufficient evidence supports a conviction, we must view the evidence in the light most favorable to the government and decide whether a reasonable fact finder could have reached a conclusion of guilt beyond a reasonable doubt." *United States v. Facey*, 386 Fed. Appx. 910, 913 (11th

Cir. 2010) (citing *United States v. Herrera*, 931 F.2d 761, 762 (11th Cir. 1991)).

III.     A district court's decision to expand upon initial jury instructions when a jury question arises is reviewed for abuse of discretion. *United States v. Lopez*, 590 F.3d 1238, 1253 (11th Cir. 2009).

IV.     A circuit court reviews the substantive reasonableness of a sentence for abuse of discretion using a two-step process. *United States v. Tome,* 611 F.3d 1371, 1378 (11th Cir. 2010). It looks at whether the district court committed any significant procedural error and then whether the sentence is substantively reasonable under the totality of the circumstances. *Id.*

## SUMMARY OF THE ARGUMENT

The district court erred in denying the Appellant's Motion to Suppress regarding: (1) the unlawful seizure of physical evidence and any subsequent statements made after he was illegally detained; and (2) the incriminating statements he made to the federal agent and task force officer after his arrest. The Appellant had valid constitutional challenges to the legality of the stop, as well as the voluntariness of his statements. Suppression was warranted. The Appellant's conviction should be vacated.

The district court erred in denying the Appellant's motions for judgment of acquittal where the Government failed to prove, beyond a reasonable doubt, that the

Appellant was guilty of knowingly and intentionally possessing with intent to distribute Eutylone, knowingly possessing a firearm in furtherance of the drug trafficking charge, and knowingly possessing a firearm, in and affecting interstate commerce, while knowing that he had been previously convicted of a crime punishable by imprisonment for a term exceeding one year. The evidence introduced by the Government was insufficient to sustain a conviction. Accordingly, the district court should have granted judgment of acquittal under Federal Rule of Criminal Procedure 29(a). The Appellant's conviction should be vacated.

The district court abused its discretion and erroneously provided supplemental jury instructions that exceeded the scope of the question that the juror asked, substantially changed the initial instructions, and impaired defense counsel's closing arguments, such that the Appellant suffered prejudice. A new trial free from such error would be warranted if the Appellant were not already entitled to have his conviction vacated.

The district court erroneously overruled the Appellant's objection to the overbreadth of Florida's statute, erroneously imposed an unreasonable variation, and erroneously imposed a substantially unreasonable sentence. Appellant would be entitled to a resentencing free from such errors if the Appellant were not already entitled to have his conviction vacated.

## <u>ARGUMENT AND CITATION OF AUTHORITY</u>

## I.  THE  DISTRICT  COURT  ERRED  IN  DENYING  THE APPELLANT'S MOTION TO SUPPRESS.

The district court erred in denying the Appellant's motion to suppress: (1) the unlawful seizure of physical evidence and any subsequent statements made after he was illegally detained; and (2) the incriminating statements he made to the federal agent and task force officer after his arrest. The Appellant had valid constitutional challenges to the legality of the stop, as well as the voluntariness of his statements.

The Fourth Amendment protects individuals from unreasonable search and seizure. *See* U.S. Const. amend IV. This protection extends to the search of automobiles. *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (citing *Delaware v. Prouse*, 440 U.S. 648, 662 (1979)). "A traffic stop, however, is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with [*Terry v. Ohio*, 392 U.S. 1, 88 (1968)]." *United States v. Harris*, 526 F.3d 1334, 1335 (11th Cir. 2008). "When determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'" *Id.* (quoting *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999)). "A determination of reasonable suspicion is based on the totality of the circumstances, and '[i]t does not require officers to catch the suspect in a crime. Instead, [a]

reasonable suspicion of criminal activity may be formed by observing exclusively legal activity.'" *Id.* (quoting *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). Evidence which is seized in violation of the Fourth Amendment is inadmissible pursuant to the exclusionary rule, which extends not only to the primary evidence obtained as a direct result of an illegal search or seizure but also to evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." *Wong v. United States*, 371 U.S. 471 (1963).

### A) Illegal stop and seizure of evidence

Below, with respect to Point 1, the Appellant argued in his Motion to Suppress that O'Grady did not have reasonable suspicion that the Appellant was engaged in unlawful activity, citing *Whren v. United States*, 517 U.S. 806, 809 (1996); and that he did not violate a traffic law, so his stop and detention were in violation of the Fourth Amendment such that any evidence seized or subsequent statements made after law enforcement illegally detained him should be suppressed, citing *Wong*.

At the hearing on said motion, the Appellant argued that O'Grady did not have probable cause to determine that there was a violation that a traffic infraction occurred because she could not reasonably have seen the Appellant allegedly fail to stop at the stop bar. And even if the district court did believe that that was a valid stop by the officer, she did not have reasonable suspicion that he was engaged in criminal activity because he simply pulled into a driveway. She did not just pull him

over to write a traffic citation, she was motivated to pull him over because it was a high-crime area. (Doc. 64 at 141-49).

O'Grady did not have probable cause to believe a traffic velation occurred. Florida's "stop bar" statute provides that every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop clearly at the marked stop line, but if none, before entering the crosswalk on the nearside of the intersection. Here, although O'Grady's testimony is not refuted by an eyewitness of the alleged traffic violation, because there was conveniently no one else on the road, her testimony is refuted by Calajo, who was an eyewitness to the scene itself and to the physical impossibility that O'Grady could have seen whether the Appellant committed a traffic infraction. Based on the objective facts offered by Calajo, O'Grady necessarily could not have had probable cause to believe that a traffic violation occurred. She was only able to allege that he committed a stop bar violation because she was familiar with the area and knew that there was a crosswalk there—not because she was somehow able to see 575 feet through the trees in her sideview mirror.

Although a traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment as per *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003), O'Grady's mistake of fact was not reasonable due to the great distance and otherwise obstructed visual between

her vehicle and the one the Appellant was driving. *Cf. United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000) (explaining that an officer who observed a windshield crack that ended up being only seven inches long, rather than the eight inches required by statute to render it excessive, had a reasonable mistake of fact given the evident length of the crack such that the defendants constitutional rights were not violated by the officer's stop of his vehicle). Her belief was unreasonable, and she did not have probable cause. Thus, the stop was invalid and violated the Appellant's constitutional rights.

Moreover, there was no reasonable suspicion of criminal activity. "Reasonable suspicion must be more than an inchoate and unparticularized suspicion or hunch." *Acosta*, 363 F.3d at 1145. (internal quotation marks omitted). O'Grady specifically testified that she looped back around to check up on the Appellant because she was "just following suspicion as if he's doing something illegal or not," which is clearly an unparticularized suspicion. Further, the record reflects that the only thing the Appellant did was allegedly stop in the crosswalk on a blind corner, pull into a residential address, and turn his lights off—there is no evidence of alleged violation(s) of other traffic laws and Appellant's actions of pulling into a residence and turning his lights off are fully innocuous. And even though a reasonable suspicion of criminal activity may be formed by observing exclusively legal activity, the Appellant's legal activity does not even come close to rousing suspicion. *Cf. id.*

(demonstrating that a defendant, who drove a car to a location, talked on the phone, and left the location, had taken legal actions that created an objectively reasonable suspicion of criminal activity when compared to the fact that the undercover officer for a drug operation told the defendant to meet at that location, talked to him on the phone at that exact moment, and told him that the meeting was postponed). O'Grady did not have any level of objective justification for making the stop, let alone a "minimal level," as required by the Fourth Amendment. *Id.* at 1154. Thus, the stop was invalid and violated the Appellant's constitutional rights.

Further, the district court erred in finding that the drug evidence recovered near the vehicle's driver's door cannot be challenged under the Fourth Amendment because it is deemed abandoned, as per *California v. Hodari D.*, 499 U.S. 621, 629 (1991). In *Hodari*, the court found that the defendant, who began running from a cop after he saw cops approach, abandoned his cocaine because he had dropped it before the officer who was chasing him on foot made physical contact. Contrarily, in the instant case, there a traffic stop, which for reasons provided above was made without probable cause or reasonable suspicion, and "[a] traffic stop is a seizure within the meaning of the Fourth Amendment." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). As such, this Honorable Court need not determine whether a seizure actually happened like the court in *Hodari.* Moreover, the evidence did not fall from the floor of the vehicle

until *after* the officer had already ordered him to get back in his vehicle. This order constituted an additional restraint of his liberty after she had already illegal detained him, thereby further demonstrating that the contraband was seized. In sum, the evidence was not abandoned—it was seized pursuant to an illegal stop and suppression was warranted.

The court also erred in finding that the police canine's alert was sufficient in itself to give the officers probable cause to search the Appellant's vehicle, as per *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006). *Tamari* does explain that probable cause arises when a drug-trained canine alerts to drugs, but in that case, the officers conducted the first search of a car, which matched the description of the car driven by the head of a drug conspiracy and drove onto the property that was believed to be party of a drug conspiracy. Then, they conducted the second search after the detection dogs arrived. In the instant case, the dogs only came to the scene because O'Grady conducted an illegal stop and the record reflects that the paraphernalia and the gun were found as a result of the inventory search, not because of the dog's alert. Moreover, instant case is obviously different than *Tamari* because the officers here knew nothing about the Appellant and did not have probable cause before they arrived at the scene like they did in *Tamari*.

And although not all evidence need to be suppressed "simply because it would not have come to light but for the illegal actions of the police," as per *United States*

*v. Delancy*, 502 F.3d 1297, 1309 (11th Cir. 2007), the Government still has "the burden of demonstrating that evidence" from the dogs "was not obtained as a direct result of the illegal search," as per *United States v. Timmann*, 741 F.3d 1170, 1182 (11th Cir. 2013). In the instant case, the Government failed to meet that burden because the evidence was seized as per the inventory search following the illegal stop, not because of the dog's alert. Alternatively, if the evidence were found because of the dog's alert, the Government still failed to meet its burden because it only argued below that the K-9 sniff itself served as the intervening fact that possibly allowed for recovery of the firearm—assuming that it was not found in an inventory search. As such, the Government did not meet its burden below in offering what the "intervening fact" between the illegal stop and seizure and the actual sniffing of the dogs was—and it could not have done so because there was no break in the causal chain between the illegal stop and seizure, as required by *Timmann*, and the alert by the dogs. 741 F.3d at 1182. Under either theory of what led to the evidence in the vehicle being seized, all evidence seized after the dogs alerted on the vehicle should have been suppressed.

Thus, in sum, the stop was unconstitutional because she did not have probable cause, nor did she have reasonable suspicion, and all evidence seized should have been suppressed as "fruit of the poisonous tree." The Appellant's constitutional

rights were violated, and his sentence should be vacated because any remaining evidence would be obviously insufficient to support a conviction.

### B) Coercive interrogation and incriminating statements

Below, with respect to Point 2, the Appellant argued in his Motion to Suppress that when he was arrested by federal agents, the incriminating statements he made to authorities were involuntary and in violation of his Fifth Amendment rights, citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), so any statements made should be suppressed. *See* U.S. Const. amend V.

At the hearing on said motion, the Appellant argued that he had made an overt invocation of his rights; and in the alternative, that just because he signed the form that did not mean that it was the end of the inquiry into whether he waived his rights. Further, the conditions under which he allegedly waived his rights rendered any waiver invalid—he was surprised to be picked up by the special agent and task force officer, they were walking him on the side of the road on a hot day. and they asked him to sign using his own leg, but there was no formal atmosphere, and the special agent immediately confronted him regarding his DNA. (Doc. 64 at 150-52).

The statements the Appellant made after his federal arrest were made in violation of his constitutional rights. "In *Miranda v. Arizona*, the Court recognized that custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak

where he would otherwise not do freely.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). "To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Id.* However*,* "*Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived

*Id.*

And although a suspect's right to counsel must be invoked unambiguously, as per *Berghuis v. Thompkins*, 560 U.S. 370 (2010), a defendant, who not understanding his constitutional rights, does not make the formal request should not be penalized, as per *Miranda*. Further, "[a]lthough a signed *Miranda* waiver form is usually strong proof that a suspect voluntarily waived his rights, it is not conclusive on the issue."

*Hart*, 323 F.3d at 893. Again, courts must examine the totality of the circumstances. *Id.*

The record reflects that months before he was even arrested on the federal warrant, Newsom explained to the Appellant during the buccal swab that if a defendant in the federal system admitted to their own conduct and disclosed the conduct of others, they could get a benefit. (Doc. 208 at 104). Then, on the day of his arrest, he was at the county courthouse with his girlfriend, while he was represented by counsel for his state charges, and he was apprehended by surprise by the special agent and task force officer. He signed the waiver, on his own leg, while he was outside and waiting in the heat for the vehicle to come transfer him to a different courthouse. Immediately after they got into the car, the Appellant was confronted with alleged DNA evidence. And eventually, he stated, "I know you read me my rights and stuff, but I really don't know. You know what I'm saying?' (Doc. 64 at 92).

The Appellant's statement here—"I know you read me my rights and stuff, **but I don't really know**. . ."— may not be an unequivocal request for counsel, but it clearly indicates that he did not fully understand his right to remain silent nor his right to counsel and was asking for clarification of his rights. *See Hart*, 323 F.3d at 884. His confusion here makes sense in the context of being at the county court, represented by counsel, and then unsuspectingly apprehended. And he did not say,

"I know you read me my rights *and I know I signed the waiver*," which again shows that he did not understand his rights nor the alleged waiver thereof. This statement alone shows that "his waiver was not voluntary, knowing, and intelligent, as required by *Miranda*. *Id*. at 895. Thus, suppression was warranted.

Further, the special agent told him after the arrest there were only two ways to help himself: accepting the facts, admitting he was wrong, and helping the special agent catch other bad people; and towards the end, the special agent *again* said that there were two ways to help and told the Appellant to think about what he had said. (Doc. 208 at 113-15). These statements, specifically that he can only help himself by accepting the facts and admitting that he was wrong, "clearly contradicted the *Miranda* warning[s]" and "suggested to [the Appellant] that an incriminating statement would not have detrimental consequences" and would instead help him. *See Hart*, 323 F.3d at 894 (explaining the same for statements of a detective to a defendant that "honesty wouldn't hurt him"). The statements in the instant case were deceptive and misled the Appellant, and as a result of this "deception" and "contradictory statements, [the Appellant] did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it." *See id.* Therefore, his alleged waiver is not valid as per *Miranda*. His constitutional rights were violated and his sentence should be vacated because the remaining evidence would not be sufficient to support a conviction.

Moreover, the entire recording was admitted at trial and the error was not harmless. There is a more than a reasonable possibility that his statements contributed to his conviction because the jury could have misunderstood his statements regarding "touching" the gun to be an admission to possession of the gun and could have found that they disproved his theory of defense that his DNA was transferred to the gun by O'Grady, who failed to wear gloves and contaminated the gun. And because his statements regarding whether occupants were in the car varied, this made Stanley's testimony that he and Kirby were in the car, that the gun belonged to Kirby, and that Kirby dealt drugs when he could, seem uncredible. There is a "high probability" that the evidence in the recording "contributed to [the Appellant's conviction," and the introduction of [the recording] therefore was not harmless error. *Id.* at 894-96. The illegal introduction of his statements prejudiced the Appellant. His conviction should be vacated or at the very least he would be entitled to a new trial free from such harmful error.

## II. THE DISTRICT COURT ERRED IN DENYING THE APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL WHEN THE EVIDENCE PRESENTED WAS INSUFFICIENT TO SUSTAIN A CONVICTION.

On the merits, the district court erred in denying the Appellant's motions for judgment of acquittal because the evidence presented was insufficient to sustain a conviction. The Government furnished insufficient evidence connecting the

Appellant with the crimes charged. Accordingly, the district court should have granted a judgment of acquittal under Federal Rule of Criminal Procedure 29(a).

With respect to Count I:

> To support a conviction for possession with intent to distribute, the government must prove (1) knowing (2) possession of a controlled substance (3) with intent to distribute it. *United States v. Freyre–Lazaro,* 3 F.3d 1496, 1504 (11th Cir. 1993). Possession may be actual or constructive and may be proved by circumstantial evidence. *United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir. 1983).

*United States v. Farris*, 77 F.3d 391, 395 (11th Cir. 1996).

"A defendant has actual possession of a substance when he has direct physical control over the contraband." *United States v. Edwards*, 166 F.3d 1362, 1363 (11th Cir. 1999). "Constructive possession consists of the knowing exercise of or the knowing power or right to exercise dominion and control over the substance." *United States v. Knight*, 705 F.2d 432, 433 (11th Cir. 1983).

To convict the Appellant under Count II, the Government must establish at trial that he (1) possessed a firearm (2) in furtherance of (3) a drug trafficking crime. *United States v. Pérez-Greaux*, 83 F.4th 1, 23 (1st Cir. 2023).

> Mere presence of a firearm in an area where a criminal offense occurred is not enough to sustain a conviction; rather, for a person to possess a gun "in furtherance of" a drug offense, the government must establish a *sufficient nexus* between the firearm and the drug crime such that the firearm advances or promotes the drug crime. We analyze "in furtherance of" evidence from both objective and

> subjective viewpoints, taking into account that the element
> lacks a settled, inelastic, definition. As to objective
> factors, we consider (1) the proximity of the firearm to
> drugs or contraband; (2) whether the firearm was easily
> accessible; (3) whether the firearm was loaded; and (4) the
> surrounding circumstances.

*Id*. at 24. (internal citations omitted) (internal quotation marks omitted) (emphasis added). Another factor is proximity of the firearm to the drug profits. *United States v. Timmons*, 283 F.3d 1246, 1253 (11th Cir. 2002) (citing *United States v. Ceballos-Torres*, 218 F.3d 409, 414-15 (5th Cir. 2000)).

The Appellant stipulated below that he had previous pertinent convictions. Thus, to convict him under Count III, the Government must prove: (2) that he was in knowing possession of a firearm; and (3) that the firearm was in or affecting in interstate commerce. *United States v. Beckles*, 565 F.3d 832, 841 (11th Cir. 2009).

A) *Count I*

The Government failed to make a prima facie showing that the Appellant knowingly possessed a controlled substance with an intent to distribute. Direct evidence of knowledge of evidence is not necessary, it can be based upon inferences from the surrounding circumstances. *United States v. Peart*, 888 F.2d 101, 104 (11th Cir. 1989). Here, the Government did not introduce evidence directly showing that the Appellant knew the drugs and paraphernalia were tucked away, hiding somewhere in his mother's vehicle, along with her prescription medication. The video was reasonably susceptible to the interpretation that the drugs were on the

floor; and the record reflects the paraphernalia was in the driver's side door, but there is no evidence suggesting that it was plainly visible such that the Appellant could even see it. Further, the surrounding circumstances do not support an inference of knowledge—he was just driving his friends home at 1:30 AM in a high-crime area that was being patrolled by an officer who was looking for infractions. The Government did not present any evidence demonstrating *why* he was driving that night—specifically, it did not subpoena his phone records to see if he was communicating with anyone. And of note, circumstances surrounding his prior history and his suspended license—which is what O'Grady ticketed him for—readily explain why he ran from the officer.

Since the Government did not make a prima facie showing that he had knowledge, the issue of possession is moot. But on the merits, with respect to possession, proximity is not enough. The Government did not present any evidence that his DNA or fingerprints were on the drugs or paraphernalia. And again, he was driving a car that did not belong to him, and there is no evidence suggesting that the drugs or the paraphernalia were plainly visible or accessible to him while he was driving in the dark.

The issue of intent to distribute is also moot, but on the merits, the Government did not present any evidence of communication from buyers, despite having illegally seized his personal and work cell phones, thereby failing to

demonstrate his intent to distribute. Moreover, it was a small amount of drugs, and he never admitted to possessing them in the first place, despite being prompted to make incriminating statements in a coercive interrogation. The evidence of his intent to distribute drugs was tenuous. Thus, in sum, evidence is insufficient to support a conviction for Count I.

B) *Count II and III*

With respect to Counts II and III, the record reflects that the gun was found under the passenger seat, behind the bar used to adjust the seat, within a car that the Appellant did not even own. This is not enough to support a conviction. The mere fact that a defendant is "driving the car which the police found the firearm is not enough to establish dominion over the premises and thereby dominion and control over the firearm." *United States v. Bailey*, 553 F.3d 940, 947 (6th. Cir. 2009). To hold that someone driving the car as its lone occupant sufficed to establish constructive possession of a firearm found under the driver's seat would be wrongly instituting a strict-liability regime for constructive possession. *Id.* at 948.

In *Bailey,* the court described the hypothetical scenario illustrating such a regime:

> The friends listen to music in the car, talk, laugh, look out the window and are generally distracted. One friend, riding in either the front passenger seat or the passenger seat directly behind the driver, slips a small firearm onto the floorboard beneath the driver's seat unbeknownst to the driver or the other passengers. When they arrive at the

party, the driver and his friends get out of the car, and the driver locks the doors. Later that evening, the driver gets back into his car alone, turns on the ignition, and begins his trip home. When he rolls through a stop sign, police pull over his car for a traffic infraction, and they also ask for permission to search the vehicle. The driver thinks he has nothing to hide and consents to the search. The police discover a firearm beneath the driver's seat. Do we want to institute a legal rule that would mandate the conclusion that the driver has constructive possession over the firearm?

*Id.* at 947.

This hypothetical is alarmingly similar to the instant case: Appellant was at a block party with Stanley and Kirby, he drove them to the club, he drove them from the club, with Kirby in his front seat, he dropped Kirby off, Stanley moved to the front seat, Stanley ran from the car after the illegal stop, and the Appellant ran from the car because he was driving on a suspended license. Moreover, the Appellant was not even driving his own car, unlike the hypothetical and the actual defendant in *Bailey*, and Kirby put his gun under the passenger seat, rather than under the driver's seat, like the actual defendant in *Bailey*, which even further supports the reversal of the Appellant's conviction.

The Government did not present any evidence that he knew the gun was there. It only presented weak evidence via DNA that he allegedly touched it—and even if the evidence were sufficient to show beyond a reasonable doubt that the DNA was on the gun because he touched it, not because Kirby placed it in a car that the

Appellant drove and presumably touched and/or because of O'Grady's mistakes that caused her to transfer his DNA from his sweat to the gun, the Government did not present any evidence indicating *when* he might have touched it. Wandzek did not testify how long DNA remains on any given surface and it is entirely reasonable to believe that he touched it many years ago, before he was ever convicted of a felony. *See e.g., Cunningham v. Distr. Atty's Off. for Escambia Cnty.*, 592 F.3d 1237 (11th Cir. 2010) (showing a defendant who had a trial more than a decade ago sought to have DNA from a condom wrapper analyzed). Moreover, there were other contributors to the samples, and the Government did not collect any swabs aside from the Appellant and his mother, so the Government failed to provide evidence sufficient to demonstrate beyond a reasonable doubt that Appellant, rather than someone else, such as Kirby, possessed the gun.

And even if he had touched it, that does not necessarily demonstrate actual or constructive possession under the law. Moreover, the only direct evidence that he actually touched it is from his own statement that he made after he was confronted in a coercive interrogation by a special agent, who had told him months ago when he was collecting his DNA and that if a defendant in the federal system admitted to their own conduct and disclosed the conduct of others, they could get a benefit. The Government did not make a prima facie case in showing possession. As such, the Government did not meet the firearm possession element in Count II nor Count III.

Further, there was no evidence that the firearm furthered the charged crime of drug trafficking. The record reflects that the drugs and the scale were in the side of the driver's side door, his money from his settlement and his work/personal cell phones were on or about his person, and the gun was tucked away under the passenger seat. Assuming that he even knew the gun was there, the Appellant could not access the gun at all while he was driving, which is what he was doing before the illegal stop, so there was no true proximity. Further, the Government failed to put forth any evidence to demonstrate that drug activity was being conducted—it did not subpoena his phone records in an attempt to demonstrate why the Appellant was driving that night—nor did it demonstrate whether the weapon was registered to another individual, such as Kirby, or whether it was stolen. *Cf. United States v. Garcia*, 489 Fed. Appx 334 (11th Cir. 2012) (holding there was sufficient evidence to support a conviction for a defendant who drove to Florida with a firearm in the front console of his truck knowing that he would negotiate a cocaine deal). Assuming that the Government made a requisite showing of possession, which it did not, it still did not make a prima facie case in showing "in furtherance of." Thus, the evidence is insufficient to support a conviction.

Based on the above, the Government failed to prove all elements of the three crimes charged. Even viewing the evidence in the light most favorable to the nonmovant, the Government's case was at best circumstantial and, at worst, entirely

devoid of any credible evidence whatsoever of the crimes charged. As a result, the Appellant's conviction must be vacated.

### III. THE DISTRICT COURT ERRONEOUSLY SUPPLEMENTED THE JURY INSTRUCTIONS.

The district court abused its discretion and erroneously supplemented the jury instructions such that they prejudiced the Appellant to the extent that his conviction should be reversed, and the case remanded for a new trial if he were not already entitled to have his conviction vacated. A district court has "considerable discretion" regarding supplemental jury instructions, but "it does not have the discretion to misstate the law or confuse the jury." *Lopez*, 590 F.3d at 1247-48. When a statutory term is undefined, courts often turn to dictionaries for guidance. *Id.* at 1248. "A challenged supplemental jury instruction is reviewed as part of the entire jury charge, in light of the indictment, evidence presented and *argument of counsel* to determine whether the jury was misled and whether the jury understood the issues." *Id.* (emphasis added). If a defendant shows prejudice, the conviction will be reversed; "[s]uch prejudice occurs when the change in the instructions is substantial, when the instructions repudiate counsel's arguments, or when the instructions impair the effectiveness of those arguments." *Id.* at 1252-53 (quoting *United States v. Descent*, 292 F.3d 703, 707 (11th Cir. 2002).

The record reflects that a juror asked a question regarding the definition of "furtherance," and the district court provided the jury with supplemental instructions

listing factors from case law regarding "in furtherance of." As such, these facts are distinct from those in *United States v. Black*, 845 Fed. Appx. 42, 49-50 (2d Cir. 2021), which held that the supplemental instructions including factors was not erroneous, because in *Black*, the juror specifically asked for the definition of "in furtherance of" rather than "furtherance."

The erroneous supplemental instructions in the instant case prejudiced the Appellant because in defense counsel's closing argument, she only argued the following:

> [T]o prove possession of a firearm in furtherance of a drug trafficking crime is that the firearm was possessed in the furtherance of a drug trafficking crime. That means that it helped promote it or advance the crime in some way. There's no evidence of that. . . Even if you believe that Mr. Kendrick was distributing drugs, there's no evidence that the gun ever came into play. It just simply didn't happen.

Clearly, defense counsel only addressed in closing the pattern jury instructions, which explain that "in furtherance of" is "helped promote or advance the crime in some way."

Although the supplemental instructions in the instant case do not misstate the law, the Appellant was nonetheless prejudiced because the instruction was a substantial changed and it impaired the effectiveness of defense counsel's arguments because she was unable to respond and address the factors, which are obviously more descriptive and inclusive of many types of activity and behavior compared to the

broadness of "helped promote or advance the crime in some way." The Appellant was prejudiced because the instant case involved alleged facts that the jury could have believed to have aligned with factors within the erroneous supplemental instructions, and defense counsel was prevented from presenting an effective argument against the factors.

To the extent the Government relies on *Black*, as it did at trial, and argues that the district court's decision here to answer the juror's questions with substantially more detail than that they even asked for as immaterial, the Appellant would note that *Black* is not binding, does not indicate what defense counsel's closing argument was, and does not fully explain, like in *Lopez*, the factors for a circuit court to determine whether the supplemental instruction was prejudicial. The Appellant submits that this Honorable Court cannot meaningfully compare *Black* to the instant case to find that the Appellant was not prejudiced by the *de facto* impairment of defense counsel's closing argument. Based on reasons provided above, the Appellant would be entitled to a new trial free of such prejudicial error if he were not already entitled to have his conviction vacated.

IV. **THE DISTRICT COURT ERRONEOUSLY: SENTENCED THE APPELANT TO THE MANDATORY 60 MONTHS; DENIED THE APPELLANT'S OBJECTION; IMPOSED AN UNREASONABLE UPWARD VARIATION; AND ERRONEOUSLY IMPOSED A SUBSTANTIALLY UNREASONABLE SENTENCE.**

The district court erred as a matter of law in sentencing the Appellant to the mandatory 60 months minimum, as per Title 18 U.S.C. § 924(c), because, for reasons provided above, there is insufficient evidence to support a conviction for Counts I, II, and III. Specifically, there is insufficient evidence that he trafficked in drugs, that he possessed a firearm, and therefore, that he possessed a firearm in furtherance of drug trafficking. As such, the Appellants mandatory minimum under § 924(c) must be reversed.

The district court erred as a matter of law in overruling the Appellant's objection regarding the overbreadth of Florida's Statute. When the Appellant was convicted for three cocaine charges in 2015, the Florida Statute included cocaine derivatives. During sentencing for the instant case, the Federal law did not contain a reference to derivatives. Thus, the three charges should not count as an ACCA predicate. *See Brown v. United States*, 144 S. Ct. 1195 (2024) (affirming this Court's decision in *United States v. Jackson*, 55 F.4th 846 (11th Cir. 2022), which holds that determining whether a prior conviction can count as an ACCA predicate is based on the date of the conviction). As such, Appellant's level would be a 14 rather than a 20, so resentencing is warranted.

Further, the district court's statement that it would impose the same sentence whether the level were 14 or 20, without stating the justification thereof, was significant a procedural error. *See United States v. Pugh*, 515 F.3d 1179, 1189-90

(11th Cir. 2008) (noting that it is significant procedure error to fail to consider the section 3353(a) factors or failing adequately explain the chosen sentence—including an explanation for any deviation from the guidelines range). If Appellant were indeed to be considered an offense level 14, it would be substantively unreasonable for the court to impose an upward variance under the circumstances of this case, where the court indicated that the only reason for the sentence was Appellant's criminal history—which was already considered in the guidelines range. In essence, this would be a "double count" to vary upward based on criminal history alone. Similarly-situated defendants with an identical criminal history would receive a significantly lower sentence. This error is even more significant when considering that the respective guideline ranges are 37-46 months versus 70-87 months. As such, the district court would be substantively unreasonable in imposing an upward variance.

Finally, even if the Appellant's total base level were a 20, the district court's sentence was nonetheless substantively unreasonable, despite being within the guide range, because the court abused its discretion by not properly accounting for his substantial mitigation factors. A sentence may be substantively unreasonable if it does "not achieve the purposes of sentencing stated in § 3553(a)." *Pugh*, 515 F.3d at 1191, (quoting, *United States v. Martin*, 455 F.3d 1227, 1237 (11th Cir. 2006)). The purposes given by the statute include:

> to reflect the seriousness of the offense, to promote respect
> for the law, and to provide just punishment for the offense;
> to afford adequate deterrence to criminal conduct; to
> protect the public from further crimes of the defendant;
> and to provide the defendant with needed educational or
> vocational training, medical care, or other correctional
> treatment in the most effective manner.

18 U.S.C. § 3553. Moreover, in *Spears v. U.S.*, the Court emphasized that lower courts are in no way bound to apply the sentencing guidelines and can impose a sentence lower than the guidelines. *Spears v. United States*, 555 U.S. 261, 266 (2009).

The records reflects that that the Appellant has had no real opportunity for rehabilitation because he "[slid] through the cracks." Appellant was the victim of a childhood that no person should have to endure, including abject poverty, abuse, neglect, and a stay at the JJOC (a disciplinary facility for the infamous Dozier school). The district court even specifically stated with respect to these underfunded facilities that the "system itself at large" was not doing its job and that things might have been different if the Appellant's problems were addressed at the dependency hearing that was held when he was a child. (Doc. 212 at 17-21). Given the significant mitigation factors, the Appellant's lack of violent criminal history, and that the Government did not present sufficient evidence to show that he possessed the gun nor that he possessed in in furtherance of drug trafficking, the global incarcerative sentence of 144 months is significantly greater than necessary.

Therefore, in light of the arguments presented above, this Court should find that the district court abused its discretion numerous times during sentencing and that the sentence imposed by the district court is substantively unreasonable. If Appellant were not already entitled to have his conviction vacated, This Court should find that the Appellant is entitled to have his sentence vacated and his case remanded with directions for a new sentencing hearing.

## CONCLUSION

Based on the arguments, facts, and case law presented above, the Appellant's judgment and sentence should be vacated, and the challenged evidence should be suppressed. Alternatively, the Appellant is entitled to a new trial and/or judgment of acquittal. Alternatively, the Appellant is entitled to be resentenced.

Respectfully submitted,

By:

/s/ Olivia M. Goodman
Olivia M. Goodman, Esquire
Florida Bar No.: 1025589

O'Brien Hatfield P.A.
511 West Bay Street, Suite 330
Tampa, Florida 33606
(813) 228-6989

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B).

This brief contains 12, 961 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

/s/ Olivia M. Goodman
Olivia M. Goodman, Esquire
Florida Bar No.: 1025589

O'Brien Hatfield P.A.
511 West Bay Street, Suite 330
Tampa, Florida 33606
(813) 228-6989

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Initial Brief was filed on the CM/ECF system which will then provide a copy to counsel of record on this the 12th day of June 2024.

/s/ Olivia M. Goodman
Olivia M. Goodman, Esquire
Florida Bar No.: 1025589

O'Brien Hatfield P.A.
511 West Bay Street, Suite 330
Tampa, Florida 33606
(813) 228-6989